IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


CURTIS R. DAVIS                )
                               )
                               )   No. 12 C 1225
        Plaintiff,             )
                               )   Magistrate Judge Arlander Keys
     v.                        )
                               )
CAROLYN W. COLVIN,[1]          )
,                              )
Commissioner of               )
Social Security,              )
                               )
        Defendant.

MEMORANDUM OPINION AND ORDER

This case is before the Court on cross motions for summary
judgment. Plaintiff, Curtis R. Davis, asks the Court to enter
Summary Judgment in his favor, and reverse or remand a previous
administrative decision denying him Disability Insurance Benefits
("DIB"), Widower's Disability Insurance Benefits ("DWB"), and
Supplemental Security Income benefits ("SSI"). The Commissioner
seeks summary judgment affirming his decision to deny benefits.

On April 21, 2008, Curtis R. Davis filed applications for
Social Security Disability Insurance Benefits ("DIB"), Disabled
Widower's Benefits ("DWB"), and Supplemental Security Income
("SSI"). Administrative Record at 172-182.  In each of the
applications Mr. Davis alleged that his disability onset date
("AOD") was May 5, 2006. R. at 173, 176, 180.  The Social
Security Administration initially denied all three of his

applications on July 11, 2008, and again upon reconsideration on September 8, 2008. R. at 106-117. Mr. Davis then filed a written request for a hearing before an administrative law judge on October 24, 2008. R. at 96. On May 26, 2010, Mr. Davis appeared and testified at a hearing before Administrative Law Judge ("ALJ") James D. Wascher.

**II.** FACTUAL BACKGROUND

Mr. Davis is a Chicago resident born on August 5, 1954. He was 55 years old at time of the May 2010 hearing, and testified that he is 6'1", and last weighed 226 pounds. R. at 46. However, the record shows that his weight has fluctuated between 226 and 243 pounds within the last three or four years. *Id*. He is a widower with six adult children, but lives alone in his Chicago apartment. R. at 177, 181. Mr. Davis indicated that he suffers from a variety of infirmities, including chronic obstructive pulmonary disease ("COPD")/Emphysema, lower back pain, left shoulder pain, impaired vision, diabetes, high blood pressure, high cholesterol, an enlarged heart, and occasional spitting up of blood. R. at 51-57. Mr. Davis is a habitual smoker and typically smokes one pack per week. R. at 343. However, he states that he used to smoke approximately 1 pack per day for a period of 40 years. *Id*. He currently uses two inhalers to help manage his respiratory complications due to emphysema. R. at 411.

Mr. Davis has had numerous past employment positions. R. at 216-223. He has worked as a security guard, a receiving clerk, a car detailer, a housekeeper, a laborer, a driver, a warehouse supervisor, a machine operator, and a punch press operator. *Id.* He testified that he completed the first year of high school, but has not received a GED certificate. R. at 47. Mr. Davis was 51 years old on his alleged disability onset date ("AOD"), and asserts that he has not performed any substantial gainful activity since that date due to his physical impairments. R. at 203.

**III.**                                          TESTIMONIES AT THE

ADMINISTRATIVE HEARING

1. *Mr. Davis' Testimony*

At the hearing before the Administrative Law Judge, Mr. Davis testified that he became aware of his health problems during his employment as a janitor at Plastech Corporation when he fainted on the job and was taken to the emergency room. R. at 52. He stated that during that hospital stay, he learned that he had an enlarged heart, emphysema, high blood pressure, high cholesterol, and was prescribed medication for his illnesses. *Id.* Mr. Davis testified that his shortness of breath was predominately triggered by physical activity such as climbing stairs, or environmental factors such as high temperatures. R. at 54. He stated that under either of these circumstances it was

difficult for him to breathe, and he would have to use his two inhalers every day to manage the condition. R. at 54.

Mr. Davis also testified that he had been spitting up blood for about a year, and that his doctors have not been able to discern the cause of the issue, despite having taken a chest x-ray. R. at 53. He testified that he wakes up from sleeping about two or three times a week choking and spitting up blood. R. at 55. He also testified that sometimes the attacks happen during the daytime. *Id.*

Mr. Davis testified that he takes diabetes medication every morning, and his dosage has been doubled in order to keep his symptoms under control. *Id.* He also indicated that he has blurry vision and occasional numbness of his left side. R. at 57.

Mr. Davis testified that, as a result of his disabilities, he cannot stand for long periods of time. R. at 58. He claims that this hinders his ability to work in certain employment positions, and ultimately resulted in his termination as a security guard. *Id.* He testified that out of an eight hour work day, he would only be physically able to stand for a continuous period of two or three hours. R. at 59. He also stated that he has not worked in any paying employment position since his disability onset date of May 5, 2006, but has been searching for a job to no avail. R. at 51.

Mr. Davis also indicated that he had been experiencing lower back pain since the mid-1990's and increasingly severe left shoulder pain for at least 10 years. R. at 53. He testified that his doctors are still unsure as to what is causing the left shoulder pain, but he has been scheduled for an MRI exam. R. at 55. He testified that if he uses both arms, he can lift about 30 to 40 pounds for a short period of time, but not repetitively. R. at 59.

Mr. Davis' current prescription regimen is extensive. According to his testimony, his treating physicians have prescribed him medications for an enlarged prostate, high cholesterol, high blood pressure, emphysema, diabetes and pain. R. at 60. He stated that the medications often cause him to experience side effects such as drowsiness and lack of energy, which often require him to nap. *Id.*

Mr. Davis also testified that his typical daily activities consist of staying at home watching TV, and occasionally going out for holidays, special occasions or on Sundays for church when a friend or relative picks him up. R. at 61. He stated that, although he lives alone, his family members help him with activities such as grocery shopping and lifting heavy laundry. R. at 62. However, he testified that he is capable of completing everyday tasks such as cooking and cleaning on his own. *Id.*

**2. Dr. Cavanaugh: Medical Expert Testimony**

Next, the ALJ heard from Dr. John Cavanaugh, M.D., a board certified internist with a practice in cardiology. Dr. Cavanaugh testified as a Medical Expert ("ME") pursuant to 20 C.F.R. §416.927(e)(2)(iii). R. at 62. Dr. Cavanaugh testified that objective medical evidence dating back to June of 2008 supports the diagnosis of a left shoulder strain, mild COPD, hypertension, and poorly controlled non-insulin dependent Type 2 diabetes. R. at 66. However, he stated that none of those impairments met or equaled any Listing, and none showed objective evidence of end organ damage. R. at 66.

Dr. Cavanaugh also testified that, with Mr. Davis' identified impairments, he would be able to stand, walk and sit for up to six hours out of an eight-hour workday, and that he would be able to lift 10 pounds frequently and 20 pounds occasionally. R. at 67. Dr. Cavanaugh opined, "the evidence, in my estimation does not meet or equal a Listing, but would be consistent with a light level of activity with only occasional overhead reaching with the left arm, and only moderate levels of respiratory irritants and exposure to temperature extremes." R. at 66.

Dr. Cavanaugh clarified that, although Mr. Davis' poorly controlled conditions will likely worsen overtime, his assertion that he is only able to stand for two or three hours out of an eight-hour workday is unsupported by the record. R. at 67-68.

### 3. *Cheryl Hoiseth: Vocational Expert Testimony*

Vocational Expert ("VE"), Cheryl R. Hoiseth, also appeared and testified at the administrative hearing on May 26, 2010. R. at 68. Ms. Hoiseth testified that, when considering Mr. Davis' advanced age, limited education and physical limitations, he would be incapable of performing his past relevant work. R. at 70, 73-74. Additionally, she testified that, although Mr. Davis maintained three semi-skilled positions in the past, none of those positions have skills that are transferrable to sedentary work. R. at 73. However, Ms. Hoiseth further indicated that there are other jobs that Mr. Davis would be capable of performing, within the national or regional economy. R. at 74.

Ms. Hoiseth identified three representative occupations that a person with Mr. Davis' age, education, work experience, and residual functional capacity would be capable of performing: machine packager (2,000-3,000 jobs in the greater Chicago area), food service worker (2,000-3,000 jobs in the same area), and hand packager (10,000 jobs in the same area). R. at 74. She testified that these three positions are listed in the DOT as medium exertion level jobs. *Id.*

The ALJ then asked Ms. Hoiseth if there were any light exertional level positions in the national economy that a person with Mr. Davis' age, education, work experience, and residual functional capacity would be capable of performing. R. at 75.

7

Ms. Hoiseth indicated that, at 55 years of age, the Medical-Vocational Guidelines ("the Grid") would be used to determine whether Mr. Davis could engage in substantial gainful activity. R. at 75. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1998).

The ALJ then asked Ms. Hoiseth to identify any positions in the national economy that would be available to persons under the age of 55 with Mr. Davis' characteristics. R. at 75. Ms. Hoiseth proceeded to identify three additional positions: hand packager, housekeeping cleaner, and electronics worker, as eligible positions for hypothetical people under the age of 55 possessing Mr. Davis' education and work experience. *Id.* Ms. Hoiseth clarified that, if the individual were to be off task for 20% of the workday or more, such limitations would preclude all work. R. at 76-77. She added that, if Mr. Davis could stand for just two to three hours, as he asserted, he would not be able to perform any of the identified jobs. R. at 77. She also noted that, in general, the tolerance for absences for the jobs identified is about one and a half days per month, and just a half a day for new employees. R. at 77.


**IV.**                                         MEDICAL EVIDENCE

In addition to the testimony, the ALJ had before him medical evidence dating from April of 2001 to April of 2008. R. at 321-339. The record shows that Mr. Davis began receiving treatment

for Chronic Obstructive Pulmonary Disease ("COPD") and lower back pain in October of 2007. R. at 318. Mr. Davis also received treatment for hypertension, diabetes mellitus, and left shoulder pain between January and early April of 2008. R. at 304-317.

After Mr. Davis filed for social security benefits on April 21 2008, Internist Jeffrey Ryan, M.D., conducted an Internal Medicine Consultative Examination of Mr. Davis on June 21, 2008. R. at 342. Dr. Ryan then submitted his findings to the Bureau of Disability Determination Services. R. at 342. Dr. Ryan described Mr. Davis as a "well developed, well nourished man, who is pleasant and cooperative, and in no apparent distress." R. at 343. He further stated, "[Mr. Davis] is able to ambulate about the examination room and get on/off the table without difficulty." *Id*.

During the examination, Mr. Davis reported being diagnosed with emphysema eight or nine years earlier. R. at 342. Mr. Davis also asserted in the examination that his condition was getting progressively worse, and that he had been experiencing shortness of breath when performing minor activities such as climbing 10 stairs, walking eight blocks, or running for the bus. *Id.* Mr. Davis communicated to Dr. Ryan that he had previously gone to the emergency room for his emphysema about two to three months prior to his visit. *Id.* Mr. Davis also reported being diagnosed with

diabetes and high cholesterol within the eight months prior, and hypertension for 20 years with no complications. R. at 343.

Upon concluding the examination Dr. Ryan diagnosed Mr. Davis with emphysema, diabetes, high cholesterol, high blood pressure, and left shoulder pain. R. at 344. Dr. Ryan concluded that, while Mr. Davis' range of motion in his left shoulder was significantly limited, his grip strength in his left hand was only slightly less than his right at a 4+/5. R. at 343. However, he was still able to form a complete fist with both hands and his manual dexterity was normal. *Id.* He also concluded that Mr. Davis' diabetes, high cholesterol, and high blood pressure showed no evidence of end organ disease. *Id.* Finally Dr. Ryan indicated that Mr. Davis' blood pressure was 160/110, and that he "did have some scattered rhonchi[1] heard bilaterally in his lungs." R. at 343.

Soon after, in May 2008, Mr. Davis supplemented his social security disability application with a Physical Impairments Questionnaire describing his daily living activities. R. at 270. He indicated that he experiences "lots of pain in left arm and shoulder" when he attempts to carry grocery bags, laundry or attempts to take out the trash. *Id.* He asserts that he has

---

[1] *Rhonchus* is a wheezing or snoring sound heard upon auscultation of the chest, caused by accumulation of mucus or other material. - Dictionary.com

trouble with lifting his left arm overhead, and also with sudden backward movements. *Id.*

He further indicated that he regularly has shortness of breath, and suffers from emphysema and a "bad heart"; at night he wakes up spitting up blood and has reoccurring chest and back pains. R. at 271. Finally, he indicated on the form that he is capable of sitting for at least two hours, but has to take frequent breaks after any kind of physical activity. *Id.*

Less than a month after Dr. Ryan's examination, Dr. Bonnie W. Thomas, M.D., treated Mr. Davis for diabetes, COPD, lower back pain, and left shoulder pain rated at an 8 out of 10 in severity on July 9, 2008. R. at 381. The following day, non-examining State-agency reviewer, Dr. Ernst Bone, M.D., conducted a Physical Residual Functional Capacity Assessment of Mr. Davis' condition. R. at 364-371. Dr. Bone concluded that Mr. Davis had only non-exertional limitations, and no visual or communicative limitations. R. at 365, 367. He also concluded that Mr. Davis did have some postural limitations, and that he could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds. R. at 366. He determined that Mr. Davis could frequently balance, stoop, kneel, crouch, and crawl without limitation. R. at 366. Dr. Bone further opined that Mr. Davis could perform limited reaching in all directions including overhead. R. at 367.

Dr. Bone, like Dr. Ryan, concluded that Mr. Davis experienced shortness of breath after climbing 10 stairs, walking 8 blocks, or running to catch a bus. R. at 366. Also, like Dr. Ryan, Dr. Bone concluded that, although Mr. Davis' grip strength in his left hand was slightly weaker than in his right, he could still make a complete fist with both hands, and his manual dexterity was normal in both hands. R. at 367.

With regard to environmental limitations, Dr. Bone indicated that, due to his emphysema, Mr. Davis should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, gases, or poorly ventilated areas. R. at 368. Dr. Bone also diagnosed Mr. Davis with diabetes, high cholesterol, and high blood pressure, and affirmed that these conditions showed no evidence of end of organ disease. R. at 371. Based on the medical evidence provided and Dr. Bone's RFC report, the Social Security Administration denied Mr. Davis' social security benefits claim on July 11, 2008, and again upon reconsideration on September 8, 2008. R. at 83-85, 86-88.

The record shows that Mr. Davis was further treated for his left shoulder pain and diabetes, and also began receiving treatment for blurred vision, weakness, and numbness in June of 2009. R. at 400. He proceeded to have an x-ray taken of his left shoulder at this time, which showed no signs of fractures or dislocations in the shoulder, but showed some degenerative

changes that could have been the cause of his pain. R. at 433. Mr. Davis continued to receive treatment from Dr. Thomas into the beginning of 2010 for his worsening eyesight, diabetes, high cholesterol, and high blood pressure. R. at 409.

Finally, on March 24, 2010, Dr. Liana G. Palacci, D.O., conducted a consultative examination of Mr. Davis, and diagnosed him with well-controlled emphysema, poorly controlled Type-2 noninsulin dependent diabetes, and left shoulder pain R. at 414.

In the examination with Dr. Palacci, Mr. Davis indicated that he had been diagnosed with emphysema and diabetes 10 years prior. R. at 411. He stated that he had a history of tobacco use for 41 years, and uses two Albuterol inhalers twice a day, especially upon performing exertional activities. *Id.* Mr. Davis denied any hospitalizations due to his emphysema, and denied any shortness of breath. *Id.* With regard to his diabetes, Mr. Davis told Dr. Palacci that his blood sugar runs in the 280s, and that he often experiences blurry vision, dry mouth, and numbness in his hands and feet. *Id.*

Mr. Davis also communicated to Dr. Palacci that he had been having left shoulder pain for six years, but all past tests had been inconclusive. R at 411. He claimed that he wore a sling for six months, but received no physical therapy or injections for the pain. *Id.* He also told Dr. Palacci that he could perform overhead activity with occasional difficulty. *Id.*

Dr. Palacci completed a medical source statement, and opined that Mr. Davis was capable of lifting and carrying 10 pounds continuously, 11-20 pounds frequently, and 21-50 pounds occasionally. R. at 416. She also stated that Mr. Davis was capable of sitting, standing, and walking for up to five uninterrupted hours, and that he would be able to sit, stand, and walk for a total of seven hours out of a typical eight hour work day. R. at 417. In the statement, Dr. Palacci also indicated that Mr. Davis' lungs were free of rhonchi or wheezes, he does not use a cane to walk, and is right hand dominant, but frequently has trouble reaching with his left arm due to shoulder pain. R. at 413, 418.

Dr. Palacci's statement differed from Dr. Bone's earlier report that stated that Mr. Davis could only *occasionally* climb stairs, ramps, ladders, and scaffolds; she determined that he could do so *continuously*. R. at 419. Dr. Palacci also determined that Mr. Davis could frequently tolerate exposure to dust, odors, fumes, and pulmonary irritants. R. at 420.

The record also includes a Cook County Bureau of Health Service report indicating that, as of March 25, 2008, Mr. Davis was taking approximately nine different prescription medications in order to manage his diabetes, high blood pressure, high cholesterol, COPD/Emphysema, and left shoulder pain. R. at 427. However, soon after filing for social security benefits Mr. Davis

14

submitted a Disability Report to the Social Security
Administration Field Office listing 13 prescriptions, and later
submitted another form listing as many as 17 medications
prescribed to him by various physicians. R. at 230, 259-261.

**V.**                                       THE ALJ'S DECISION

The ALJ held the hearing for Mr. Davis' case on May 26,
2010. R. at 130.  He rendered his decision on October 21, 2010,
and after considering all of the evidence presented, ruled that
Mr. Davis was not disabled within the meaning of the Social
Security Act. R. at 30.  In so doing, the ALJ applied a five-step
sequential analysis as required by the Social Security Act, under
20 C.F.R. § 404.1520(a).

At step one, the ALJ determined that Mr. Davis had not
engaged in substantial gainful activity since his alleged onset
date of May 5, 2006. R. at 23.

At step two, the ALJ determined that Mr. Davis' emphysema,
diabetes mellitus, corrected vision, and osteoarthritis of his
left shoulder were severe impairments that caused significant
limitations in his ability to perform basic work activities. *Id.*

At step three, the ALJ determined that these impairments, or
combination of impairments did not meet or medically equal one of
the listed impairments from 20 C.F.R. Part 404, Subpart P,
Appendix 1 (20 C.F.R. § 404.1520(d), 404.1525 and 404.1526). *Id.*

Between steps three and four the ALJ examined Mr. Davis'
residual functional capacity, and determined that Mr. Davis had
the RFC to perform medium work as defined in 20 C.F.R. §
404.1567(c) and 416.967(c). *Id.* He explained, that this included
lifting up to 50 pounds occasionally, and 25 pounds frequently;
standing and walking up to six hours in an eight-hour workday;
occasionally climbing ladders, ropes, scaffolds, ramps, or
stairs; occasionally reaching overhead with his left hand; with
no concentrated exposure to extreme heat, cold, wetness,
humidity, or pulmonary irritants. *Id.* The ALJ also stated that
Mr. Davis' had 20/50 vision in each eye. *Id.*

The ALJ indicated that he considered all symptoms and the
extent to which they would reasonably be accepted as consistent
with the objective medical evidence, as required by 20 C.F.R. §
404.1529 and 416.929 and SSR's 96-4p and 96-7p. *Id.* He also
briefly summarized Mr. Davis' testimony, and considered all
opinion evidence in accordance with the requirements of 20 C.F.R.
§ 404.1527 and 416.927 and SSR's 96-2p, 95-5p, 96-6p and 06-3p.
*Id.* The ALJ determined that it is reasonable to believe that Mr.
Davis' "medically determinable impairments would cause the
alleged symptoms," but that "his statements were not credible to
the extent that they are inconsistent with the residual
functional capacity assessment." R. at 24. The ALJ supported his

determination by addressing each of Mr. Davis' medically
determinable impairments individually.

In terms of Mr. Davis' emphysema, the ALJ held that,
according to the medical records, Mr. Davis' emphysema was
present at approximately the same level of severity prior to the
alleged onset date. R. at 26. He also noted that Mr. Davis had
been able to work despite his condition in the past, and opined
that this evidence suggested he could continue to work despite
his impairments. *Id.* The ALJ also determined that Mr. Davis'
emphysema was actually improving; he noted the records showing
that his lungs were clear of infiltrations, he had no pulmonary
restrictions and no active cardiopulmonary pathology. *Id.* The
ALJ also included environmental irritant limitations in the RFC
to accommodate Mr. Davis' respiratory impairment. *Id.*
Additionally, the ALJ referenced a March 25, 2008, chest x-ray
showing that Mr. Davis' lungs were clear and that his heart was a
normal size. *Id.*

With regard to Mr. Davis' diabetes mellitus and high
cholesterol, the ALJ concluded that, with appropriate
accommodations for Mr. Davis' diabetes, blurred vision and proper
medication, he would still be able to work at the medium
exertional level, even with the various limitations. R. at 27.
Specifically, to accommodate for Mr. Davis' blurred 20/50 vision

in each eye, he should be limited to occasional climbing of ladders, ropes, scaffolds, ramps, or stairs. *Id.*

Lastly, in considering Mr. Davis' left shoulder pain, the ALJ noted that the medical records showed a progression of osteoarthritis of the left shoulder. *Id.* He included in his assessment limitations on overhead reaching with the left (non-dominant) hand, and determined that Mr. Davis would still be able to perform at a medium exertional level with these limitations. *Id.*

For the most part, The ALJ adopted Dr. Palacci's medical opinion. R. at 28. However, he held that Mr. Davis was only capable of standing, walking, and sitting for six hours per workday instead of seven hours as Dr. Palacci opined. *Id.* The ALJ explained that he gave less weight to the opinion of the non-examining medical expert, Dr. John Cavanaugh, because Dr. Cavanaugh's opinion, that Mr. Davis was only capable of performing "light exertional" work, was inconsistent with the objective medical evidence, and contrary to the opinions of previous medical examiners whose opinions were more consistent with the medical records. R. at 28.

At step four, after considering the testimony of the VE, the ALJ determined that Mr. Davis' impairments would unquestionably preclude him from performing any of his past relevant work, pursuant to 20 C.F.R. § 404.1565 and 416.965.

At step five, however, the ALJ found that there are other jobs in the national economy that Mr. Davis would be capable and qualified to perform given his work experience, education, age, and residual functional capacity. R. at 28-29.  Adopting the VE's determination that Mr. Davis would be able to perform jobs such as a machine packager, a food service worker, and a hand packager, the ALJ found Mr. Davis to be "not disabled."  R. at 29. The ALJ concluded, therefore, that Mr. Davis was not entitled to social security benefits.

On November 11, 2010, Mr. Davis submitted a request to the Appeals Council for review of the ALJ's final hearing decision. R. at 15.  The Appeals Council sent Mr. Davis a notice denying his request for review on January 4, 2012 and, thus, affirmed the ALJ's decision as the final decision of the Commissioner of Social Security. R. at 1.

After the Appeals Council denied review, Mr. Davis filed a civil lawsuit in this Court on February 21, 2012, seeking judicial review of the Social Security Administration's final decision. Both parties consented to proceed before a Magistrate Judge, and the case was reassigned to this Court on March 22, 2012. The case is now before this Court on cross motions for summary judgment. Mr. Davis is asking the Court to enter summary judgment in his favor, and reverse or remand the previous

administrative decision for further proceedings. The Commissioner
seeks summary judgment affirming the agency's decision.

**VI.**                                    **DISCUSSION**

STANDARD OF DISABILITY ADJUDICATION

An individual claiming a need for DBI, SSI or DWB must prove
that he is disabled under the terms of the Social Security Act.
In determining whether an individual is eligible for benefits,
the social security regulations require a sequential five-step
analysis. First, the ALJ must determine if the claimant is
currently employed; second, he must determine whether the
claimant has a severe impairment; third, he must determine
whether the impairment meets or equals one of the impairments
listed by the Commissioner in 20 C.F.R. Part 404, Subpart P,
Appendix 1; fourth, the ALJ must determine the claimant's RFC,
and must evaluate whether the claimant can perform his past
relevant work; and fifth, the ALJ must decide whether the
claimant is capable of performing other work in the national
economy. At steps one through four, the claimant bears the burden
of proof; at step five, the burden shifts to the
Commissioner. *Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995)*.

STANDARD OF REVIEW

A district court reviewing an ALJ's decision must affirm if
the decision is supported by substantial evidence and is free
from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart, 290*

20

F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). When reviewing the administrative record to determine if the supporting evidence is substantial, the Court may not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). An ALJ must articulate, at least minimally, his analysis of the evidence so that the Court can follow his reasoning. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the district court. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990).

Although an ALJ is not required to address every piece of evidence in the record, he must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, thus allowing a reviewing court to conduct a meaningful review of the ultimate findings of the Social Security Administration. *Sims v. Barnhart,* 309 F.3d 424, 429 (7th Cir. 2002); *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). A court must affirm the ALJ's decision if there is substantial

evidence supporting it, unless the ALJ does not articulate the grounds for his decision in such a way that allows a meaningful review. *Sims,* 309 F.3d at 429. The Court may affirm the Commissioner's decision only after a "critical review of the evidence." *Lopez,* 336 F.3d at 539. Where there is an error of law, reversal is warranted irrespective of the volume of evidence otherwise supporting the ALJ's decision. *Schmoll v. Harris,* 636 F.2d 1146, 1150 (7th Cir. 1980).

## ANALYSIS

Mr. Davis argues that the ALJ's decision should be reversed or remanded because the decision was not supported by substantial evidence, and contained errors of law. He argues that the ALJ rendered, (1) an improper RFC determination, and (2) an improper credibility determination. These are the only two matters Mr. Davis has raised before this Court, thus, any other disputes pertaining to the subject are hereafter waived. *Carter v. Astrue,* 413 Fed. Appx. 899, 905 (7th Cir. 2011); *Skarbek v. Barnhart,* 390 F.3d 500, 505 (7th Cir. 2004); *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001); *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000).

**1. *The ALJ's RFC Determination***

Mr. Davis asserts that the ALJ rendered an improper RFC determination because he failed to establish a logical bridge between the acknowledged impairments presented in the evidence,

22

and the limitations incorporated in the RFC. An ALJ must build a "logical bridge" from the evidence to his conclusions. *Grove v. Apfel,* 148 F.3d 809, 810 (7th Cir. 1998). A decision that is "unreasoned" or analytically inadequate cannot be upheld. *Id.*

Specifically, Mr. Davis argues that there is no logical bridge between the medical findings in the record that he suffered from uncontrolled diabetes, and the ALJ's restriction on his ability to climb ladders, ropes, scaffolds, or ramps. Although uncontrolled diabetes, by itself, may not always necessitate these precise limitations, even Mr. Davis admits that his diabetes causes symptoms of fatigue and pain. Naturally, these symptoms would limit Mr. Davis' ability to perform physical activities such as climbing ladders, ropes, scaffolds, or ramps. Additionally, Mr. Davis' blurred vision would undoubtedly be an additional encumbrance on performing such activities. Yet, even with these limitations, Dr. Palacci concluded that Mr. Davis would be able to work at a medium exertional level, and the ALJ agreed that the identified restrictions were appropriate to accommodate Mr. Davis' diabetes and blurred vision. Therefore, the ALJ has made a logical connection between the physical symptoms of Mr. Davis' uncontrolled diabetes, and the physical limitations set forth in the RFC assessment.

It was also reasonable for the ALJ to limit Mr. Davis to occasional overhead reaching with his left, non-dominant arm.

While it is true that Mr. Davis may experience some limitation in shoulder motion in all directions, Dr. Ryan's consultative examination shows that Mr. Davis struggled predominately with flexion and internal rotation of his left shoulder. R. at 347. Mr. Davis' left shoulder extension was at 20° out of a possible 40°, his abduction 100° out of 150°, his adduction 30° out of 30°, and his external rotation 90° out of 90°. *Id.* However, the flexion of his left shoulder, at 90° out of a possible 150°, and his internal rotation at 10° out of 80°, showed significant range of motion limitation. *Id.* The ALJ also mentioned that Mr. Davis reported being able to perform overhead activity with *occasional* difficulty during his consultative examination with Dr. Palacci. R. at 25. He also stated that he never had physical therapy or injections for his shoulder pain, although he did wear a sling for 6 months. *Id.* The ALJ found it reasonable to accommodate for Mr. Davis' left shoulder limitations by limiting him to only occasional reaching overhead in the RFC assessment. *Id*.

Significantly, none of Mr. Davis' treating or examining physicians indicated that a limitation predominantly on overhead reaching would be unsuited for accommodating Mr. Davis' osteoarthritis. Additionally, Mr. Davis failed to specify any potential employment position in which he would be required to perform substantial reaching activities in any direction other than overhead. The VE indicated that, with Mr. Davis' age,

education, work experience, and RFC, he would be able to perform the occupational requirements for employment as a machine packager, a food service worker, and a hand packager. R. at 74. Even if these employment positions require reaching in all directions, according to Mr. Davis' RFC results, he would likely be able to perform such tasks without complication. Therefore, it was logical for the ALJ to accommodate for Mr. Davis' shoulder limitation in the RFC assessment by limiting him to only occasional overhead reaching, since there is no evidence in the record, or otherwise, indicating that this accommodation would be insufficient for the employment positions identified.

It is true, as Mr. Davis argues, that the ALJ must "build a logical bridge from the evidence to his conclusion." But, when analyzing an ALJ's opinion for fatal "gaps" or contradictions, courts tend to give the opinion a "commonsensical reading rather than 'nitpicking' at it." *Shramek, 226 F.3d at 811*. This tendency is not only an attempt to facilitate an efficient and effective judicial review process, but is also a part of a well-settled precedent that, notwithstanding abuses of discretion or errors of law, courts will give deference to administrative agencies in the interpretation and implementation of their policies. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). The ALJ in this case sufficiently built a "logical bridge," and this

Court is able to follow the evidence to his conclusion. *Giles ex rel. v. Astrue,* 483 F.3d 483, 486 (7th Cir. 2007).

Next, Mr. Davis argues that the ALJ rendered an improper RFC determination because he gave controlling weight to Consultative Examiner, Dr. Palacci, instead of the testifying Medical Expert, Dr. Cavanaugh. The ALJ opined that, "[Dr. Palacci's] medical opinion is more consistent with the record as a whole." R. at 28.

The Social Security regulations require an ALJ to take each opinion he receives under careful consideration. 20 C.F.R. § 404.1527(d), and 416.927(d). A statement made by a medical source that an individual is "disabled" or "unable to work" is not a definite determination of that individual's disability status. 20 C.F.R § 404.1527. In the hierarchy of weighing medical opinions, the regulations state that, generally, controlling weight is given to the opinions of treating physicians so long as the opinion is supported by the medical findings, and not inconsistent with other substantial evidence in the record. *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003); *see* 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2). In Mr. Davis' case, none of his treating physicians have provided an opinion about his ability to perform work-related activities. However, the regulations also state that more weight will generally be given to the opinion of an examining physician, rather than a physician who has not examined the patient. 20

C.F.R. § 404.1527(c)(1), 416.927 (c)(1). Therefore, since Dr. Palacci conducted a consultative examination of Mr. Davis, and Dr. Cavanaugh formed his opinion solely from reviewing Mr. Davis' medical records, it is reasonable for the ALJ to give Dr. Palacci's examining medical opinion more weight than that of the testifying ME.

As long as the ALJ minimally articulated his reasoning for crediting or rejecting evidence of disability, his decision may be upheld. *Clifford, 227 F.3d at 871.* In this case, the ALJ clearly stated that his reason for discrediting the ME testimony was because it was "inconsistent with the objective medical evidence, and contradicts the contemporaneous consultative examiner's opinion which is more consistent with the record as a whole." Thus, he has met his burden of "minimally articulating" his reasoning for giving one opinion more weight than another. *Skarbek,* 390 F.3d at 503.

Additionally, after closely examining the ME's testimony, it appears to the Court that the inconsistent statements were likely unintentional. The ME testified that Dr. Palacci concluded that Mr. Davis was capable of performing only light exertional level work, consisting of lifting 10 pounds frequently and 20 pounds occasionally. R. at 66. However, Dr. Palacci's assessment was

actually consistent with "medium work" levels as defined in 20 C.F.R. § 404.1567(c).[2]

This seemingly insignificant numerical discrepancy must be given adequate consideration because, under the Medical Vocational Guidelines 202.01 and 202.02 ("the Grid"), Mr. Davis' disability status turned on whether he could perform light or medium exertional work. 20 C.F.R. Pt. 404, Subpt. P, App. 2. The Grid is a chart that classifies a claimant as disabled or not disabled based on the claimant's physical capacity, age, education, and work experience. *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987). It was promulgated to simplify the process, and improve the consistency, of disability determinations. *Id.* If the use of the Grid is appropriate, the Secretary may rely upon it for determining disability, and, in such a case, the Grid alone constitutes substantial evidence sufficient to uphold the decision of the Secretary. *Id.* The use of The Grid is a question of fact, the ALJ must determine whether the claimant's non-exertional impairments are severe enough to substantially limit the claimant's abilities. *Id.* at 641. Therefore, due to Mr. Davis' advance aged, limited education, and semi-skilled past relevant work with no transferable skills to sedentary work, if Mr. Davis were capable of only light work, he would be classified

---

[2] Medium work involves lifting no more than 50 pounds at a time, with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c).

as disabled under the Grid. On the other hand, if he were capable of performing medium work, he would not automatically be classified as disabled under the Grid, and additional considerations would be necessary.

As previously mentioned, Dr. Palacci's assessment actually stated that Mr. Davis was capable of lifting 10 pounds continuously, 20 pounds frequently, 50 pounds occasionally, and never more than 50 pounds. R. at 416. This, as Dr. Palacci concluded, is consistent with a medium exertional level instead of light, as the ME (mis)stated. Under these circumstances, Medical Vocational Guidelines 203.11 and 203.12 would apply to Mr. Davis' case, and he would not be considered disabled for social security disability purposes.

Nothing in the medical evidence supports the ME's conclusion that Mr. Davis was only capable of lifting 10 pounds frequently, and 20 pounds occasionally. In fact, Mr. Davis himself testified that he is capable of lifting 30 to 40 pounds for short periods of time, and indicated that he lifted 25 pounds frequently, and as much as 75 pounds during his previous employment as a warehouse supervisor. R. at 59, 209.

After examining the medical record, and considering all of the medical opinions, the ALJ adopted Dr. Palacci's opinion that Mr. Davis was capable of medium exertional work. R. at 28. When the ME's testimony is read in context, it appears that the ME

actually intended to affirm Dr. Palacci's opinion. R. at 66-67.

Thus, since it seems that the ME's conclusion, that Mr. Davis was

only capable of light exertional work, is based on a

misinterpretation of Dr. Palacci's opinion, and is unsupported by

any other evidence in the record, including Mr. Davis' own

testimony, it was reasonable for the ALJ to give controlling

weight to Dr. Palacci's consultative opinion instead of the ME's

opinion.

### 2. *Credibility Determination*

In addition to analyzing the objective medical evidence in

the record, an ALJ must also consider the impairments or

restrictions a claimant says affect his daily activities, efforts

to work, or any other relevant matters that are not substantially

supported by medical evidence. 20 C.F.R. § 404.1512(b). The ALJ

in this case stated:

> "After careful consideration of the evidence, the
> undersigned finds that the claimant's medically determinable
> impairments could be expected to cause the alleged symptoms;
> however, the claimant's statements concerning the intensity,
> persistence and limiting effect of these symptoms are not
> credible to the extent that they are inconsistent with the
> above residual functional capacity assessment."   R. at 24.

Although the use of this "opaque boilerplate" language in

making credibility determinations has been criticized by the

Seventh Circuit Court of Appeals, *see Bjornson v. Astrue*, 671

F.3d 640, 644 (7th Cir. 2012), the ALJ in this case did not stop

his analysis there. He went on to provide a detailed analysis of

the evidence and medical conclusions drawn by each of the physicians involved in Mr. Davis' case. R. at 24-27. The ALJ's opinion must be detailed enough to "inform the reader in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Bjornson,* 671 F.3d at 645 (7th Cir.2012). While a written evaluation of every piece of evidence in the record is not required, an ALJ must at least clearly articulate his assessment of the evidence to enable a reader to trace the path of the ALJ's reasoning. *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir. 1996). From reading the ALJ opinion, the reader must be able to determine what weight the trier of fact gave the claimant's testimony. *Bjornson,* 671 F.3d at 645.

The ALJ in this case did clearly articulate his assessment of the evidence. Although he may not have had an elaborate discussion of every intricate issue, "no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) (Posner, J.) *see also S.E.C. v. Chenery Corp.,* 318 U.S. 80 (1943). In general, an ALJ's credibility determination is afforded special deference, because the ALJ is in the best position to see and hear the witness and determine credibility. *Shramek*, 226 F.3d at 811. As long as that

determination is supported by substantial evidence and free of legal error, reviewing courts will uphold the ALJ's determination. 42 U.S.C. §405(g).

The ALJ in this case concluded that Mr. Davis' testimony was only partially credible. R. at 27. He individually addressed each of the inconsistencies in Mr. Davis' testimony, such as the claimed enlarged heart, elevated glucose levels, and, as previously mentioned, the lifting capabilities. He acknowledged that, although the inconsistent information may not have been intentionally misleading, it did "suggest that the information provided by the claimant generally may not be entirely reliable." R. at 27.

The ALJ then considered Mr. Davis' daily activities, and his claimed restrictions on such activities. R. at 27. Mr. Davis testified that he lives alone and performs everyday tasks such as cooking and performing light chores. R. at 62. However, due to numbness and weakness in his left arm, he often needs assistance from his family to help him with activities that require heavy lifting, such as grocery shopping or doing laundry. R. at 62. The ALJ also noted Mr. Davis' visual restrictions, and specifically noted that they have been accounted for in the RFC assessment. R. at 27.

While it is reasonable for Mr. Davis' numerous medications to cause at least some side effects, such as low energy or

sleepiness, the ALJ pointed out that Mr. Davis failed to mention these issues on numerous occasions both when he sought treatment for his impairments, and when he received consultative examinations from internal medicine physicians. R. at 27. Mr. Davis' failure to even mention these limitations suggests that his side effects were not so severe that they would substantially impact his ability to work. Finally, the ALJ discredited Mr. Davis' assertion that he could only stand between two and three hours per day, noting that this limitation was unsupported by the longitudinal record. R. at 27. Both Dr. Palacci and the ME concluded that Mr. Davis could stand for longer that two to three hours per day. R. at 25-26. Ultimately, the ALJ adopted the more restrictive six-hour sitting and standing allowance proposed by the ME, instead of seven hours as Dr. Palacci opined. R. at 28. Nonetheless, even with limiting Mr. Davis' ability to sit and stand to only six hours, the ALJ still concluded that he would be able to perform medium level exertional work.

Additionally, Mr. Davis argues that the ALJ failed to factor his obesity into his analysis. He argues that his obesity contributes to his fatigue and his inability to sustain exertional activities, and to meet the demands of competitive employment. He argues that, because the ALJ neglected to directly address this issue in his decision, he relied on "illogical foundations" and the decision should be reversed or

remanded. Mr. Davis does not explain how his alleged obesity would have affected the ALJ's five-step analysis. Rather, he suggests that the ALJ's failure to mention his obesity is reason enough to remand the case.

Mr. Davis is correct that Social Security Ruling 00-3p requires an ALJ to consider the effects of obesity at several points in the five-step sequential analysis. *Skarbek,* 390 F.3d at 504. And it is also true that obese individuals typically experience additional limitations when performing exertional functions. But Mr. Davis has never claimed obesity as an impairment (in his disability application or at his hearing). And he never indicated that he experienced exertional difficulties because of his weight. Mr. Davis bears the burden to articulate how his alleged obesity limits his functioning and exacerbates his impairment. *Hisle v. Astrue*, 258 F. App'x 33, 37 (7th Cir. 2007). In his testimony at the hearing, he noted that his doctor had advised him to lose weight. R. at 46. But such a suggestion is appropriate for diabetes patients, as well as for obese patients. Nowhere else in the record does Mr. Davis (or any doctor) mention weight as an impairment.

Additionally, although references to a claimant's weight in the medical records may be enough to trigger the issue, Skarbek, 390 F.3d at 504, in Mr. Davis' case, the issue is not clear cut. Mr. Davis argues that he was obese under the standards set forth

by the National Institutes of Health. The standard states that a BMI of more than 30.0 is obese, and a BMI of more than 40.0 is "extreme obesity." Standing at 6'1", Mr. Davis would meet the definition of obesity at approximately 228 pounds, which would give him a BMI of 30.1.[3] Mr. Davis testified that he weighed 246 pounds at the time of the hearing, which would have made his BMI 32.5.[4] However, throughout the medical record, Mr. Davis' weight fluctuated between 224 and 243 pounds. At the time of Dr. Palacci's consultative examination, Mr. Davis weighed 224 pounds, which would have put him under the obesity threshold with a BMI of 29.6.[5] Given that his weight was, at best, on the threshold, the Court cannot fault the ALJ for failing to focus on obesity.

In *Prochaska v. Barnhart*, the claimant argued that the ALJ ignored the effect of her "documented obesity on her osteoarthritis in both knees and acute spasmodic back pain," when he should have recognized that her obesity, in tandem with her diagnosed back impairment, created a disability. *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006). In particular, she argued that the ALJ violated Social Security Ruling 02-1p, which states that the adjudicator "will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." SSR 02-1p. *Id.* The

---

[3] Calculation by: nhlbisupport.com/bmi/
[4] Calculation by: nhlbisupport.com/bmi/
[5] *Id.*

Seventh Circuit held that failure to explicitly address the claimant's obesity may be considered "harmless error" where the ALJ both adopted "the limitations suggested by the specialists and reviewing doctors who were aware of the condition" and the claimant failed to "specify how [his] obesity further impaired [his] ability to work." *Prochaska,* 454 F.3d at 736-37. The case is directly on point.

In Mr. Davis' case, the ALJ stated that he reviewed all of the medical evidence and ultimately adopted Dr. Palacci's medical opinion to make his decision. R. at 28. That opinion was given when Mr. Davis weighed 224 lbs. – he was not obese then, though he was overweight. This evidence, together with the lack of any real focus on weight or obesity, explains why the ALJ failed to discuss obesity. That was reasonable under the circumstances.

Finally, Mr. Davis indicated both in his testimony at the hearing, and in his hand-written letter to the ALJ, that he has consistently sought employment even after filing for social security disability benefits. R. at 51, 283. At the hearing he stated, "I've tried to find a job, but never found one," and in his letter he wrote "since my denial, I have tried [to find employment] for a year now with no success." *Id.* Although this is unfortunate, this testimony suggests that the ALJ's decision of non-disability is supported by substantial evidence. Social security disability benefits are reserved for those who are

unable to engage in substantial gainful activity. 20 C.F.R. §
404.1520(a) and 416.920(a).  The fact that Mr. Davis thinks he
can work – as evidenced by the fact that he is actually looking
for work – is strong evidence that he can work. The fact that Mr.
Davis sought employment after filing for social security
disability benefits strongly suggests that, even he believed he
was capable of engaging in substantial gainful activity.  In
short, by his own admission, he was out of work, not because he
was unable to work, but because he was unable to find a job.

CONCLUSION

For the reasons set forth above, the Court finds that the
ALJ's RFC and credibility determinations were supported by
substantial evidence and that his decision is otherwise free from
legal error.  Accordingly, the Commissioner's final decision
denying Mr. Davis social security disability benefits is
affirmed.  The Court grants the Commissioner's motion for summary
judgment [Docket #15] and denies Mr. Davis' motion for summary
judgment [Docket #13].

Date: April 30, 2013

                                             E N T E R
                          E D:


                          _____
                          MAGISTRATE JUDGE ARLANDER KEYS
                          UNITED STATES DISTRICT COURT

37

1. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is, therefore, substituted for Michael J. Astrue who served as Commissioner when this case was filed. See Fed. R. Civ. P. 25(d)(1).